1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11

GREATER STOCKTON CHAMBER OF
12  COMMERCE, et al.,
                                        CIV. NO. S-09-3308 LKK/JFM
13                  Plaintiffs,

14            v.

15  J. CLARK KELSO, et al.,                  O R D E R

16                  Defendants.
    _____/

17

18       In <u>Plata v. Schwarzenegger</u>, No. C-01-1351 TEH, the Northern

19  District of California appointed a Receiver to oversee provision

20  of medical care by the California Department of Corrections and

21  Rehabilitation ("CDCR").  The Receiver proposed construction of a

22  prison medical facility near Stockton, California.  The Greater

23  Stockton Chamber of Commerce, the City of Stockton, and the County

24  of San Joaquin argue that the procedures involved in this proposal

25  violate the California Environmental Quality Act ("CEQA").  These

26  parties collectively filed a petition for a writ of mandamus

1   in Superior Court for the County of San Joaquin to that effect.
2   Respondents to this petition are the Receiver, the California
3   Prison Healthcare Receivership Corporation, and CDCR (California
4   Department of Corrections and Rehabilitation).   The Receiver
5   removed to federal court, invoking the federal officer removal
6   statute, 28 U.S.C. § 1442.  Once removed, this case was related to
7   Coleman v. Schwarzenegger, No. Civ. 90-520, a class action
8   challenging CDCR's provision of mental health care.

9       Petitioners move for a remand to state court, and additionally
10  challenge the decision to relate this case to Coleman.  The court
11  resolves the matter on the papers, supplemental briefing, and two
12  rounds of oral argument.   For the reasons stated below,
13  petitioners' motion is denied.

14                        **I. BACKGROUND**

15      In two cases, Plata and Coleman, classes of California inmates
16  challenge CDCR's provision of physical and mental health care.
17  Both cases are at issue in this motion, in that the Receiver was
18  appointed in one, Plata, and this court determined that the instant
19  CEQA suit was related to the other, Coleman.  The court summarizes
20  the pertinent history of each case here.[1]

21

22      [1] In both class actions, plaintiffs have sought an order
    reducing California's inmate population.   In accordance with the
23  Prison Litigation Reform Act, a single three-judge district court
    was formed to consider this request as it applied to both cases.
24  A recent order of this three-judge court provided an expansive
    history of both cases.  Coleman v. Schwarzenegger, No. Civ. 90-520,
25  2009 WL 2430820, 2009 U.S. Dist. LEXIS 67943 (E.D. Cal. Aug. 4,
    2009) (three judge court).  Much of the history provided here is
26  drawn from this order.

                              2

**A.   <u>Plata</u>**

In 2001, a class of inmate-patients filed the case now denominated <u>Plata v. Schwarzenegger</u>, No. C01-1391 TEH (N.D. Cal.), alleging that the California prison medical healthcare delivery system violated the Eighth Amendment.

> The <u>Plata</u> plaintiffs and defendants negotiated a stipulation for injunctive relief, which the <u>Plata</u> court approved by court order. [¶] However, defendants proved incapable of or unwilling to provide the stipulated relief. Three years after approving the stipulation as an order of the court, the <u>Plata</u> court conducted an evidentiary hearing that revealed the continued existence of appalling conditions arising from defendants' failure to provide adequate medical care to California inmates. . . . Following that hearing, the <u>Plata</u> court concluded that it had no choice but to place the CDCR's medical health care delivery system in Receivership.

<u>Coleman</u>, No. Civ. 90-520, 2009 WL 2430820 at *3, 2009 U.S. Dist. LEXIS 67943 at *46 (E.D. Cal. Aug. 4, 2009) (three judge court). On February 14, 2006, the <u>Plata</u> court appointed the Receiver "with the goals of restructuring the day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable." <u>Plata</u>, No. C01-1391 (N.D. Cal. Feb. 14, 2006) ("Order Authorizing Receiver" or "OAR"). The current Receiver, J. Clark Kelso, was substituted for the original Receiver on January 23, 2008.

The <u>Plata</u> court conferred on the Receiver "all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of

3

1  the California prison medical health care delivery system."  OAR

2  ¶ II.A.  In exercising this authority, the Receiver must "make all

3  reasonable efforts to exercise his powers . . . in a manner

4  consistent with California state laws, regulations, and contracts."

5  Id. ¶ II.D.  But if the Receiver

> 6  finds that a state law, regulation, contract,
>    or other state action or inaction is clearly
> 7  preventing [him] from developing or
>    implementing a constitutionally adequate
> 8  medical health care system, or otherwise
>    clearly preventing [him] from carrying out his
> 9  duties . . . and that other alternatives are
>    inadequate, the Receiver shall request the
> 10 Court to waive the state or contractual
>    requirement that is causing the impediment.
> 11 Upon receipt of any such request, the Court
>    shall determine the appropriate procedures for
> 12 addressing such request on a case-by-case
>    basis.

13

14  Id.

15      The Receiver incorporated the California Prison Healthcare

16  Receivership Corporation ("CPHRC") soon after he was appointed.

17  See Receiver's First Bi-Monthly Report, filed in Plata July 5,

18  2006, at 12.  At that time, the Receiver explained that CPHRC

19  "provide[s] a corporate embodiment for the Office of the Receiver.

20  Most of the affairs of the Office of the Receiver, such as staff

21  employment, contracting and banking, are being conducted through

22  [CPHRC]."  Id.  According to the present Receiver, by January 2008,

23  CPHRC had grown to include a number of staff and to participate in

24  day to day provision of medical care to prisoners incarcerated in

25  CDCR.  March 11, 2010 Decl. of Receiver Clark J. Kelso, ¶ 11.

26  However, the Receiver has since transferred "most of the managerial

4

1   and administrative activities" back to CDCR, such that CPHRC

2   currently employs "senior staff counsel and [only] three other

3   employees." Id. ¶ 12.

4        In June of 2009, CPHRC was suspended by the California

5   Secretary of State for failure to file the biennial Statement of

6   Information required of non-profit corporations. Cal. Corp. Code

7   §§ 6210, 5008.6. CPHRC has since filed the required statement, and

8   has been reinstated in good standing.

9   **B.    Coleman**

10       In a separate case, filed a decade before Plata, a class of

11  prisoners challenges CDCR's provision of mental health care.

12  Coleman, No. Civ. 90-520. In Coleman the undersigned determined

13  that California provides constitutionally inadequate mental health

14  care, and throughout the Coleman litigation, the court has noted

15  "the need for additional treatment space at every level of the

16  mental health care delivery system." Coleman Order of Aug. 4, 2009

17  at 28, 2009 WL 2430820, at *15, 2009 U.S. Dist. LEXIS 67943, at *84

18  (three judge court) (citing Special Master's Resp. to Court's May

19  17, 2007 Req. for Information at 5).

20  **C.    The Proposed California Health Care Facility**

21       Throughout the Plata Receivership, the Receiver has worked to

22  increase the clinical and bed space for inmate patients. In

23  December 2006, the Receiver first reported to the Plata court on

24  his plans to construct new facilities to provide as many as 5000

25  beds for inmate patients. Plata Receiver's Third Bi-Monthly

26  Report, Dec. 5, 2006, 27-28 (filed in this case as Resp'ts' Ex. 7).

1   One such new facility is the proposed California Health Care
2   Facility ("CHCF"),[2] a 1.2 million square foot, 1,734 bed medical
3   prison facility to be located in unincorporated San Joaquin County
4   near southeast Stockton.  Of these beds, over 600 are planned to
5   be used for provision of mental health care.  <u>Coleman</u> Defs.' Resp.
6   to Court's Sept. 24, 2009 Order That Defs. File A Detailed Long-
7   Range Bed Plan, Attach. A at 6 (filed Nov. 6, 2009); <u>see also</u>
8   <u>Coleman</u> Order filed January 4, 2010.

9       A draft Environmental Impact Report ("EIR") for the CHCF
10  proposal was released on October 24, 2008.  The draft EIR states
11  that "CPR [the California Prison Health Care Receivership
12  Corporation], act[ed] as lead agency under the California
13  Environmental Quality Act" and that "CPR is acting in the capacity
14  of a state agency and is the lead agency under CEQA with primary
15  authority over the project."  Pet'rs' Req. for Judicial Notice
16  ("RFJN") Ex. 1 (Draft EIR at 2-1).  The draft was circulated for
17  public comment through December 8, 2008.  This draft was also filed
18  with the Governor's Office of Planning and Research.

19      All three petitioners submitted comments regarding the draft.
20  Notably, the County questioned whether the Receiver was a local,
21  state, or federal agency.  Pet'rs' RFJN Ex. 2 (Final EIR 3.13-4).
22  These distinctions mattered, the County argued, because state and
23  local agencies are subject to differing obligations under CEQA, and
24  because federal entities may be subject to the National

25  ──────────────
26      [2] This facility has also been referred to as the "Consolidated
    Care Center."

1  Environmental Policy Act's separate provisions.  Id.

2      Three months after the close of the public comment period, on

3  March 16, 2009, the final EIR was released.  Like the draft EIR,

4  the final EIR states that CPHRC is the "lead agency" for the

5  project, although the Receiver disputes the meaning of these

6  statements.  Petitioners contend that the final EIR responded to

7  the County's earlier inquiry by explicitly identifying the

8  Receiver/CPHRC as a state agency.  Petitioners rely on the

9  following language from the final EIR:

10          As executive manager of medical care in the
           California state prisons, the Receiver acts as
11          a state agency until such time that control
           over the prison health care reverts back to
12          CDCR.  In this capacity, the Receiver has the
           principal responsibility for carrying out and
13          approving the proposed project, as is the
           responsibility for all lead agencies.
14          Therefore, the Receiver, acting through
           [CPHRC], is the lead agency for the proposed
15          project under CEQA (see Section 15367 of the
           State CEQA Guidelines), which is similar to
16          other state and/or CDCR CEQA review processes
           . . . For purposes of clarification, the
17          Receiver, acting as the lead agency, is
           obligated to comply with CEQA's substantive
18          and procedural requirements.

19  Pet'rs' RFJN 2 (Final EIR at 3.13-56).  Unlike the draft EIR, the

20  final EIR was not filed with the Governor's Office of Planning and

21  Research.  Am. Pet. ¶ 21.

22      Six months later, in September 2009, CDCR delegated authority

23  to the Receiver to certify the EIR, to make mandatory findings, and

24  to approve the project on behalf of CDCR.  Am. Pet. ¶ 22.

25      Petitioners allege that the project was discussed and modified

26  at various subsequent proceedings from which petitioners were

7

1  excluded.   On October 1, 2009, the Receiver completed a 33 page
2  "Technical Memorandum Environmental Review of Minor Changes to the
3  Proposed Project," which discussed deviations from the proposal as
4  it was evaluated by the draft and final EIRs.   Id. ¶ 23.
5  Petitioners allege that although this memorandum was provided to
6  some  public  agencies,  it  was  not  provided  to  the  Chamber;
7  petitioners do not specify whether the City and County were among
8  the agencies that received copies of this memorandum.   Id.   On
9  October 10, 2009, the Receiver allegedly discussed the status of
10  the project with unspecified parties at the offices of the State
11  Bar of California, but the three petitioners were not informed of
12  these meetings.   Id. ¶ 28.
13      On October 12, 2009 the Receiver certified the EIR, adopted
14  findings of fact and a statement of overriding considerations, and
15  approved the Project.   The Secretary of CDCR concurred.
16  **D.   Procedural History**
17      Petitioners filed a petition for writ of mandate challenging
18  the project's CEQA compliance in state court on November 19, 2009,
19  and filed an amended petition a week later.   Petitioners bring six
20  causes of action, all under CEQA, for:
21      1.   Failure to adequately address alternatives.
22      2.   Failure to adequately disclose and mitigate significant
           impacts, including impacts on public services, water
23           supply, energy impacts, air quality, traffic, climate
           change, growth, and cumulative effects.
24
25      3.   Failure to adequately respond to comments.

26      4.   Use of the "technical memorandum" rather than a revised
           EIR.

1        5.    Adopting findings without proper support.

2        6.    "Unlawful delegation of authority."

3   Although the petition states, in one sentence, that the writ of

4   mandate is necessary "to ensure that the Respondents comply with

5   all applicable Federal, State, and local laws," Amended Petition

6   at 2, the petition does not otherwise cite or explicitly invoke any

7   federal law.

8        Respondents removed to federal court, citing 28 U.S.C. §

9   1442(a)(1) and (3).  This court then ordered this case related to

10  Coleman.

11       Petitioners moved to remand and alternatively for

12  reconsideration of the order relating this case to Coleman.  The

13  court initially heard the matter on January 25, 2010.  At that

14  hearing, petitioners indicated that their sixth claim was

15  predicated in part of the fact that CPHRC had been suspended.

16  Because this basis for the claim was not apparent from the petition

17  or briefing, the court continued the hearing and granted the

18  parties an opportunity to submit further briefing.  After the

19  additional briefing was submitted, the court again heard the matter

20  on March 22, 2010.

21       In the interim, petitioners filed a "request for hearing"

22  pursuant to California Public Resources Code section 21167.4, and

23  the court held a Fed. R. Civ. P. 16 scheduling conference.  On the

24  parties' stipulation, the court ordered that "state procedures, in

25  so far as they do not conflict with federal procedure, will govern

26  resolution of the petition."  Order of March 2, 2010.  Respondents

1  lodged the proposed administrative record on March 1, 2010, and the

2  court ordered petitioners to be prepared to file objections to the

3  record shortly after the March 22 hearing.   The court further

4  ordered the parties to be prepared to propose a schedule for

5  further handling of this case at that time.

6  **II. Discussion**

7      Petitioners make three arguments for remand: that removal was

8  improper under 28 U.S.C. section 1442, that the Receiver waived the

9  right to invoke section 1442, and that this court should abstain

10 under Burford v. Sun Oil, 319 U.S. 315 (1943).   The court rejects

11 each of these arguments.   The court further re-affirms that this

12 case was properly related to Coleman, and sets a schedule for

13 further proceedings in this matter.

14 **A.   Removal under 28 U.S.C. § 1442**

15     The Receiver removed under 28 U.S.C. section 1442, which

16 provides in pertinent part:

17              (a) A civil action . . . commenced in a State
                court against any of the following may be
18              removed by them to the district court of the
                United States for the district and division
19              embracing the place wherein it is pending:

20                  (1) . . . any officer (or any person
                    acting under that officer) of the United
21                  States or of any agency thereof, sued in
                    an official or individual capacity for
22                  any act under color of such office . . .
                                                         .
23
                    (3) Any officer of the courts of the
24                  United States, for any Act under color of
                    office or in the performance of his
25                  duties[.]

26 As this section has been interpreted, a party seeking removal

10

1  thereunder must show that "(a) it is a 'person' within the meaning

2  of the statute; (b) there is a causal nexus between its actions,

3  taken pursuant to a federal officer's directions, and plaintiff's

4  claims,[ ] and (c) it can assert a 'colorable federal defense.'"

5  Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir.

6  2006) (quoting Jefferson County v. Acker, 527 U.S. 423, 431

7  (1999)).  The first two of these three requirements stem from the

8  statutory text; to be an officer acting "under color of office,"

9  there must be a causal connection between the charged conduct and

10  the asserted official authority.  Jefferson County, 527 U.S. at

11  431.

12      The third requirement, for a "colorable federal defense," is

13  distinct.  Id., Mesa v. California, 489 U.S. 121, 136 (1989).  A

14  "causal nexus" does not itself demonstrate the existence of a

15  federal defense, and a federal officer cannot automatically remove

16  merely on the ground that a state court may be biased in its

17  application of state law.  Mesa, 489 U.S. at 137-38.  The officer

18  must demonstrate that the case "arises under" a federal law other

19  than a "purely jurisdictional" statute.  Id. at 137.[3]  For purposes

20  of section 1442, assertion of a colorable federal defense satisfies

21

22      [3] Mesa held that if section 1442 were interpreted as allowing
    such "protective" removal akin to diversity jurisdiction, the
23  statute would risk violating Article III's jurisdictional limits.
    Because the Court found that the history of the statute weighed
24  against this interpretation, the Court declined to reach the
    constitutional question.  Justice Brennan, joined by Justice
25  Marshall, filed a concurrence opining that the majority's approach
    would permit protective removal absent a federal defense in an
26  extraordinary case.  489 U.S. at 140.

11

1  this requirement--section 1442, unlike 28 U.S.C. sections 1331 and

2  1441, does not require that the federal issue appear on the face

3  of a well pleaded complaint.  Id., see also Kircher v. Putnam Funds

4  Trust, 547 U.S. 633, 644 n.12 (2006).  More broadly, section 1442,

5  unlike section 1441's general removal provisions, is to be

6  "liberally construed."  Watson v. Philip Morris Cos., 551 U.S. 142,

7  147 (2007).

8      The court analyzes the pending motion under this framework.

9  The parties, however, primarily rely on two other cases.  The more

10  recent case is Medical Dev. Int'l v. CDCR, 585 F.3d 1211 (9th Cir.

11  2009) ("MDI").  MDI considered a separate suit against the Plata

12  Receiver, and a similar removal.  Plaintiff MDI provided medical

13  services to CDCR without a finalized contract.  The Receiver

14  terminated MDI's services, and MDI was not paid for much of its

15  work.  MDI filed suit against the Receiver, who removed under 28

16  U.S.C. section 1442(a)(1) and (3).  The Ninth Circuit concluded

17  that removal was proper.  The panel's analysis of removal was

18  brief, and is repeated here in its entirety:

19        It is obvious that the requirement for removal
             under the statute is met.  "[A] Receiver is an
20        officer of the courts of the United States .
             . . ."  [Ely Valley Mines, Inc. v. Hartford
21        Acci. & Indem. Co., 644 F.2d 1310, 1312 (9th
             Cir. 1981)].  "The requirement of 'any act
22        under color of such office' has been construed
             as requiring a causal connection between the
23        charged conduct and the official authority."
             Id. at 1313. That connection is established
24        where the challenged conduct involves actions
             "entrusted" to the Receiver "in his capacity
25        as Receiver."  [Gay v. Ruff, 292 U.S. 25, 39
             (1934)].  Because MDI has conceded that it is
26        suing the Receiver over the performance of his

court-appointed duties, the nexus is present.
See Arizona v. Manypenny, 451 U.S. 232, 242,
101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)
(explaining that "the right of removal"
created by § 1442(a) "is absolute for conduct
performed under color of federal office, and
. . . the policy favoring removal should not
be frustrated by a narrow, grudging
interpretation of § 1442(a)(1)" (internal
quotation marks omitted)).

MDI, 585 F.3d at 1216 (omissions in MDI). The panel held that the

district court therefore had jurisdiction over the suit.[4]  MDI did

not discuss the presence of federal defenses as an element of

removal separate from the presence of a "nexus," nor did MDI cite

Mesa. Mesa was plainly satisfied, however, as the remainder of the

opinion in MDI--indeed, the bulk of the analysis--concerned two

purported federal defenses.  Accordingly, MDI does not indicate

that a federal defense is unnecessary.

The other case emphasized by the parties is Ely Valley Mines,

Inc. v. Hartford Acci. & Indem. Co., 644 F.2d 1310 (9th Cir. 1981).

Ely Valley Mines concerned claims against a Receiver who had been

appointed to oversee a bankrupt mining operation.  Plaintiff

claimed that the Receiver falsely testified to the district court,

obtained wrongful orders from the district court, failed to comply

with various court orders, and that the Receiver was vicariously

liable for failure to maintain the business's property.  Id. at

1312.  The Ninth Circuit held that:

---

[4] Plaintiff in MDI did not timely move to remand, and thereby
waived procedural objections to removal.  MDI, 585 F.3d at 1216.
In this case, none of petitioners' arguments for remand are
procedural.

1
2
3
4

> removal by a federal court appointed Receiver is proper under 28 U.S.C. § 1442(a) when the plaintiff is challenging the Receiver's personal dereliction in the execution of the Court's orders or judgments but not when the Receiver is negligent in performing duties not entrusted to him by the courts.

5 Id. at 1313. The court primarily relied on Gay v. Ruff, 292 U.S.

6 25 (1934), which held that a Receiver overseeing a railway

7 corporation could not remove a claim that he was vicariously liable

8 for wrongful death arising from a train's operation. Ely Valley

9 Mines contrasted the state law vicarious liability claim in Gay

10 with the claim concerning the Receiver's conduct "before the

11 appointing court" at issue in Ely Valley Mines, concluding that

12 removal was proper for the latter. Id. at 1313. The court noted

13 that the defenses would involve an examination of the Receiver's

14 duties, but the court did not specifically identify or discuss any

15 possible federal defenses. Id.

16 In this case, both sides attempt to read too much into Ely

17 Valley Mines. Petitioners heavily rely on Ely Valley Mines's

18 "personal dereliction in the execution of the Court's orders"

19 language. They argue that an allegation of "dereliction" is a

20 necessary prerequisite to removal, and that dereliction requires

21 negligence or bad faith, neither of which is alleged by

22 petitioners' CEQA claims. See Reply at 2-3. The court, however,

23 understands "personal dereliction," as used in Ely, to merely refer

24 to a breach of an obligation imposed on the Receiver personally.

25 Furthermore, the key concern in the passage quoted above is not the

26 degree of culpability, but rather the source of the obligation,

1 i.e., whether the claim pertains to a duty specific to the
2 Receivership.  Finally, to the extent Ely's interpretation of
3 section 1442 differs from Durham's three-factor test, any
4 differences are attributable to the Supreme Court's intervening
5 decisions in Mesa and Jefferson County.  Durham, Mesa, and
6 Jefferson County are therefore controlling.

7     The court similarly rejects respondents' contention that Ely
8 Valley Mines established a rule that a Receiver may remove unless
9 a claim "involve[s] only state law and the Receiver is charged only
10 with vicarious wrongdoing."  Opp'n at 8 (quoting Ely Valley Mines,
11 644 F.3d at 1313).  Ely Valley Mines held that removal of such a
12 claim would be inappropriate, but as the other cases cited above
13 demonstrate, these are not the only claims that are non-removable.

14 **B.   The Three-Factor Durham Test Is Satisfied Here**

15     As noted above, Durham provides a three factor test for
16 federal officer removal.  MDI compels the conclusion that the first
17 two of these factors are satisfied here.  In this case, as in MDI,
18 it is clear that the Receiver is a "person" within the meaning of
19 section 1442(a), and an officer of the federal courts.  585 F.3d
20 at 1216.  MDI further establishes that a "nexus" exists.  Id.
21 Petitioners assert, with little discussion of MDI, that MDI is
22 factually distinct because "[i]n managing daily CDCR operations,
23 such as certifying EIRs, the Receiver follows state law and thus
24 acts under state authority."  Reply at 3.  However, petitioners
25 offer no explanation as to how the Receiver's management of service
26 providers in MDI was not equally bound by state law and taken under

1  state authority.  Accordingly, petitioners fail to distinguish MDI

2  in this regard.

3      The remaining question is whether the Receiver has raised a

4  colorable federal defense.  In this context, colorable is a low

5  threshold.  A defense need not be "'clearly sustainable'" in order

6  to be colorable.  Jefferson County, 527 U.S. at 432 (quoting

7  Willingham v. Morgan, 395 U.S. 402, 407 (1969)).  "The officer need

8  not win his case before he can have it removed."  Willingham, 395

9  U.S. at 407.  Instead, removal allows the officer to have "'the

10 validity of the [federal] defense . . . *tried* in a federal court.'"

11 Jefferson County, 527 U.S. at 431 (quoting Willingham, 395 U.S. at

12 407) (emphasis added).  Tellingly, both Jefferson County and MDI

13 found removal to be proper despite ruling against the removing

14 officers on the merits of the asserted federal defenses.  Jefferson

15 County, 527 U.S. at 531 ("[Defendants'] argument, although we

16 ultimately reject it, . . . presents a colorable federal

17 defense."), MDI, 585 F.3d at 1219, 1222.

18     In this case, the Receiver invokes three affirmative federal

19 defenses: judicial immunity, possible waiver of state law under the

20 Supremacy Clause, and the Barton rule requiring permission from the

21 appointing court before filing suit against a receiver.  The

22 Receiver further argues that his actions complied with CEQA because

23 the scope of the CEQA analysis was narrowed by his federal

24 obligations.[5]  Each of these defenses is sufficiently colorable to

25

26     [5]  Much of the parties' initial briefing focused on
petitioners' sixth claim and federal issues potentially unique

1   support removal.  Following MDI, the court begins with Barton.  As

2   this defense is sufficient, discussion of the remaining defenses

3   is dicta, and the court discusses them only cursorily.

4        As summarized in MDI, in Barton v. Barbour, 104 U.S. 126, 131

5   (1881), the Supreme Court held that "when a plaintiff sues a

6   Receiver outside of and without the permission of the appointing

7   court, the non-appointing court is without jurisdiction to

8   entertain the suit."  585 F.3d at 1216-17.  "Part of the rationale

9   underlying Barton is that the court appointing the receiver has in

10  rem subject matter jurisdiction over the receivership property.

11  As the Supreme Court explained, allowing the unauthorized suit to

12  proceed 'would have been a usurpation of the powers and duties

13  which belonged exclusively to another court.'"  Beck v. Fort James

14  Corp. (In re Crown Vantage, Inc.), 421 F.3d 963, 971 (9th Cir.

15  2005) (quoting Barton, 104 U.S. at 136, internal citations

16  omitted).  Although this rule is most often invoked in bankruptcy

17  cases, it appears to apply to receivers generally.  Id. (quoting

18  In re Linton, 136 F.3d 544, 545 (7th Cir. 1998)).

19       There is a statutory exception to this rule, under which:

20            Trustees, receivers or managers of any

21  _____

22  thereto.  As noted above, the court invited additional briefing on
    this topic. Because petitioners have since stated their willingness
23  to abandon their sixth claim, and because the court concludes that
    alternate justifications for removal exist, the court does not
24  discuss any issues particular to the sixth claim.  The court notes,
    however, that if removal were predicated solely on the sixth claim
25  (which is not the case here), abandonment of the sixth claim after
    removal would not necessarily deprive the court of the ability to
26  hear the remaining claims through the exercise of supplemental
    jurisdiction.

1
2
3
4
5
6

> property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.  Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

7  28 U.S.C. § 959(a).  In adjudicating the merits of the Barton

8  defense, the MDI court held that the Receiver's operation of CDCR

9  "fits that category of an ongoing, operating enterprise"

10 contemplated by this exception.  MDI, 585 F.3d at 1218.  The court

11 then engaged in an extensive discussion of the types of claims

12 against such enterprises that fit within the statutory exception.

13 Id. at 1218-1219.  At the end of this discussion, the MDI court

14 concluded that the plaintiff's claim could proceed "to the extent

15 that it [sought] an amount due under a contract."  Id. at 1219.

16     Because this case concerns a different type of claim, the

17 Receiver has a colorable basis for distinguishing MDI and thus for

18 invoking Barton.  Here, petitioners make no claim for money

19 damages.  Instead, they seek a writ of mandate directing

20 respondents "to immediately suspend all activities in furtherance

21 of the project," to set aside the EIR, and to comply with CEQA.

22 Amended Petition, 24.  The Supreme Court and the statutory text

23 have both recognized that injunctive relief has greater potential

24 to intrude upon the jurisdiction of the appointing court.  In

25 interpreting a predecessor to 28 U.S.C. section 959(a), the Supreme

26 Court held that a claim against a bankruptcy trustee relating to

18

the trustee's operation of a bankrupt railroad fell within the exception "so far as it involves only a money claim," but that "the issuance of an injunction against operation of the trains over respondent's tracks would have been an interference with the exclusive jurisdiction of the [appointing] court." Thompson v. Texas M. R. Co., 328 U.S. 134, 138-39 (1946). Similarly, the modern statute recognizes that the appointing court retains "equity power" over claims against a Receiver. 28 U.S.C. § 959(a).

There is therefore a colorable basis for the Receiver's invocation of Barton in this suit, notwithstanding the Ninth Circuit's holding that Barton was inapplicable on the facts of MDI. At this stage, the court does not decide the merits of the Barton defense. It may be that Thompson does not apply here, and that the factual differences between this case and MDI fail to provide a basis for distinction. These questions are nonetheless the type to be answered by a federal court. The Receiver's invocation of 28 U.S.C. section 1442 was therefore proper.

In the alternative, the court notes that the remaining defenses also support removal. As to judicial immunity, MDI also implicitly found this to be a colorable defense, and MDI's ruling on the merits of this defense, like the court's ruling on Barton, noted that plaintiff was "seeking damages for the Receiver's refusal to pay for services MDI performed under contract with CDCR." 585 F.3d at 1222. Accordingly, the Receiver may colorably argue that for purposes of judicial immunity, as for purposes of Barton, the relief sought distinguishes this case from MDI. As to

1  waiver of state law, while petitioners argue that this defense is
2  unripe, defenses, rather than claims, fall outside the ordinary
3  contours of the ripeness doctrine. Abbott Laboratories v. Gardner,
4  387 U.S. 136, 148-149 (1967), overruled on other grounds in
5  Califano v. Sanders, 430 U.S. 99, 97 (1977) (describing ripeness).
6  Assuming that, as petitioners argue, the CEQA claim's merits must
7  be resolved before waiver may be decided, petitioners provide no
8  authority for the proposition that a federal defense will only
9  support removal if the defense is immediately adjudicable, and as
10 explained below, this court need not abstain from any antecedent
11 CEQA questions. Finally, respondents' supplemental brief argues
12 that federal law defined the project needs and imposed an urgency
13 requirement that precluded the Receiver from considering additional
14 alternatives or an expanded project definition. Insofar as 28
15 U.S.C. section 1442 is to be interpreted liberally in favor of
16 removal, Watson, 551 U.S. at 147, these are both federal defenses,
17 and each is sufficiently colorable to support removal. Jefferson
18 County, 527 U.S. at 431.
19 **C.    Whether The Receiver Waived The Right to Invoke 28 U.S.C. §**
20 **1442**
21      Petitioners separately make what is best characterized as an
22 estoppel argument. They contend that the Receiver disclaimed any
23 obligations under NEPA by stating that he was acting as a state
24 agency rather than a federal agency, and that this statement
25 precludes him from now arguing that he is a federal officer capable
26 of invoking 28 U.S.C. section 1442.

20

1    The court assumes without deciding that the right to remove

2    under section 1442 can be waived.[6]   Petitioners' argument

3    nonetheless fails for at least two reasons.   First, petitioners

4    have not provided any evidence that the Receiver in fact stated

5    that he was not a federal agency subject to NEPA.   While the

6    Receiver stated that he was acting as a state agency subject to

7    CEQA, nothing here suggests that the Receiver could not have

8    simultaneously acted as a federal agency.   The statements

9    petitioners quote do not explicitly disclaim NEPA obligations, and

10   petitioners have not alleged that the Receiver made any other

11   pertinent statements.

12   Second, the question of whether the Receiver is an "agenc[y]

13   of the Federal Government" for purposes of NEPA, 42 U.S.C. §

14   4332(2), is distinct from the question of whether the Receiver is

15   an "officer of the courts of the United States" for purposes of 28

16   U.S.C. § 1442(a)(3).   Even assuming that the Receiver stated that

17   he was not an agency subject to NEPA, and that the Receiver was

18   bound by that statement, petitioners have offered no explanation

19   as to why this would preclude the Receiver from invoking section

20   1442(a)(3) as an officer of the court.

21   **D.   Abstention**

22   Petitioners' remaining argument for remand is that this court

23   should abstain under <u>Burford v. Sun Oil</u>, 319 U.S. 315 (1943).

24

25         [6] Petitioners have provided neither authority indicating that
     this right is waivable nor discussion of what facts would be
26   necessary to demonstrate waiver.

1  Burford abstention has three elements:

2          first, that the state has chosen to
           concentrate suits challenging the actions of
3          the agency involved in a particular court;
           second, that federal issues could not be
4          separated easily from complex state law issues
           with respect to which state courts might have
5          special competence; and third, that federal
           review might disrupt state efforts to
6          establish a coherent policy

7  United States v. Morros, 268 F.3d 695, 705 (9th Cir. 2001) (quoting

8  Knudsen Corp. v. Nevada State Dairy Com., 676 F.2d 374, 376 (9th

9  Cir. 1982)).

10      Federal courts have interpreted and enforced CEQA on numerous

11  occasions.   Perhaps most notably, this court has previously

12  adjudicated a CEQA claim, and has been affirmed by the Ninth

13  Circuit in so doing.   Tahoe Tavern Prop. Owners Ass'n v. United

14  States Forest Serv., No. CIV. S-06-407, 2007 U.S. Dist. LEXIS

15  35935, 2007 WL 1279496 (E.D. Cal., Apr. 30, 2007) (Karlton, J.),

16  affirmed by 314 Fed. Appx. 919, 920 (9th Cir. 2008).   The Ninth

17  Circuit and the District Courts within this state have frequently

18  entertained CEQA claims.   See City of Carmel-by-the-Sea v. United

19  States DOT, 95 F.3d 892, 899 (9th Cir. 1996) (CEQA/NEPA claim),

20  League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, No.

21  2:08-cv-2447, 2009 U.S. Dist. LEXIS 65753 (E.D. Cal. July 30, 2009)

22  (exercising supplemental jurisdiction over a CEQA claim), Cmtys.

23  for a Better Environment v. Cenco Ref. Co., 180 F. Supp. 2d 1062,

24  1088 (C.D. Cal. 2001) (same), People by California Dep't of Transp.

25  v. South Lake Tahoe, 466 F. Supp. 527, 537, 543 (E.D. Cal. 1978)

26  (holding that the Tahoe Regional Planning Agency was subject to

1   CEQA, and reserving jurisdiction to enjoin defendant from violating

2   CEQA).  In at least three other cases, the Ninth Circuit has found

3   it appropriate to interpret CEQA in the context of other claims.

4   Guru Nanak Sikh Soc'y v. County of Sutter, 456 F.3d 978, 995 (9th

5   Cir. 2006), Vieux v. E. Bay Reg'l Park Dist., 906 F.2d 1330, 1342

6   (9th Cir. 1990), South Pasadena v. Goldschmidt, 637 F.2d 677, 680

7   (9th Cir. 1981).  After thirty years of federal adjudication of

8   CEQA claims, there is no indication that such adjudication has

9   disrupted state efforts to establish a coherent policy.

10       Despite this history, it appears that only one case has

11  specifically discussed whether federal courts should abstain from

12  CEQA claims under Burford.   Emeryville Redevelopment Agency v.

13  Clear Channel Outdoor, 2006 U.S. Dist. LEXIS 34822 (N.D. Cal. May

14  22, 2006); but see United States v. California, 639 F. Supp. 199,

15  208 (E.D. Cal. 1986) (noting that a Burford argument had been

16  raised, but declining to reach the issue where, in light of a

17  parallel state proceeding abstention was separately required under

18  Younger).  Emeryville Redevelopment Agency first concluded that

19  abstention was appropriate under the separate doctrine of Louisiana

20  Power & Light Co. v. City of Thibodaux, 360 U.S. 25 (1959).  Only

21  after having determined that abstention was appropriate did the

22  court reach the issue of Burford abstention.  The court's entire

23  Burford analysis consisted of the following:

24                  the unique aspects of CEQA also favor
                    abstention under the broader abstention
25                  doctrine espoused in [Burford]. "The general
                    thrust of Burford-type abstention can be well
26                  captured by saying that abstention is ordered

1    in order to avoid needless conflict with the
     administration by a state of its own affairs."
2    Wright and Miller, Federal Practice and
     Procedure, § 4244 (2d ed. 1988). As the Ninth
3    Circuit has stated, "Burford allows courts to
     'decline to rule on an essentially local issue
4    arising out of a complicated state regulatory
     scheme.'" [Morros, 268 F.3d at 705] (internal
5    citation omitted).

6    California has a specific administrative
     mechanism to adjudicate certain CEQA matters.
7    California Public Resources Code § 21167.1 (b)
     provides:
8
          To ensure that actions or
9         proceedings brought pursuant
          to Sections 21167, 21168, and
10        21168.5 may be quickly heard
          and determined in the lower
11        courts, the superior courts in
          all counties with a population
12        of more than 200,000 shall
          designate one or more judges
13        to develop expertise in this
          division and related land use
14        and environmental laws, so
          that those judges will be
15        available to hear, and quickly
          resolve, actions or
16        proceedings brought pursuant
          to Sections 21167, 21168, and
17        21168.5.

18   Thus California has put into place a
     specialized procedure to quickly and
19   consistently resolve issues involving land use
     and the environment.  Under Burford, this
20   Court should not needlessly interfere with
     this regulatory scheme.
21

22   Emeryville Redevelopment Agency, 2006 U.S. Dist. LEXIS 34822 at

23   *12-13.  This case therefore did not discuss the third Burford

24   factor, whether federal adjudication will disrupt state efforts to

25   adopt a coherent policy.  Morros, 268 F.3d at 705.  Because the

26   court concludes that this factor is not satisfied, the court

1   declines to follow <u>Emeryville Redevelopment Agency</u>, and the court

2   need not reach that case's evaluation of the first two <u>Burford</u>

3   factors.  <u>Burford</u> abstention is not appropriate as to the CEQA

4   claims.

5   **E.  Relation to <u>Coleman</u>**

6        Finally, petitioners object to this court's order relating

7   this case to <u>Coleman</u>.  Because the challenged project involves

8   <u>Coleman</u> beds, "both actions involve the same property, transaction,

9   or event."  Local Rule 123(a)(2).  In addition, the defense of

10  waiver of state law, as it may apply to this case, overlaps with

11  the waiver issue as it has been discussed in <u>Coleman</u>.  Accordingly,

12  relating these cases furthers judicial economy, and relation was

13  proper under Local Rule 123(a)(4).

14  **F.  Fees**

15       Because petitioners' motion is denied, petitioners are not

16  entitled to fees.

17                          **IV. CONCLUSION**

18       For the reasons stated above, petitioners' motion to remand

19  (Dkt. No. 14) is DENIED.  Petitioners SHALL file objections to the

20  administrative record and a proposed schedule for the litigation

21  of this case no later than thirty (30) days from the date of this

22  order.  Respondents SHALL file a response and proposed schedule no

23  later than ten (10) days thereafter.  The court will determine at

24  that time whether a status conference is necessary.

25       IT IS SO ORDERED.

26       DATED:  April 2, 2010.

                                    LAWRENCE K. KARLTON
                                    SENIOR JUDGE
25                                  UNITED STATES DISTRICT COURT